# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, *ex rel.*           )
KATHLEEN JENNINGS, Attorney            )
General of the State of Delaware,      )
                                       )
     Plaintiff,                    )
                                       )
     v.                            )  C.A. No. N20C-09-097 MMJ CCLD
                                       )
BP AMERICA INC., BP P.L.C.,            )
CHEVRON CORPORATION,                   )
CHEVRON U.S.A. INC.,                   )
CONOCOPHILLIPS,                        )
CONOCOPHILLIPS COMPANY,                )
PHILLIPS 66, PHILLIPS 66 COMPANY,      )
EXXON MOBIL CORPORATION,               )
EXXONMOBIL OIL CORPORATION,            )
XTO ENERGY INC., HESS                  )
CORPORATION, MARATHON OIL              )
CORPORATION, MARATHON OIL              )
COMPANY, MARATHON                      )
PETROLEUM CORPORATION,                 )
MARATHON PETROLEUM                     )
COMPANY LP, SPEEDWAY LLC,              )
MURPHY OIL CORPORATION,                )
MURPHY USA INC., ROYAL DUTCH           )
SHELL PLC, SHELL OIL COMPANY,          )
CITGO PETROLEUM CORPORATION,           )
TOTAL S.A., TOTAL SPECIALITIES         )
USA INC., OCCIDENTAL                    )
PETROLEUM CORPORATION,                 )
DEVON ENERGY CORPORATION,              )
APACHE CORPORATION, CNX                )
RESOURCES CORPORATION,                 )
CONSOL ENERGY INC., OVINTIV,           )
INC., and AMERICAN PETROLEUM           )
INSTITUTE,                             )
                                       )
     Defendants.                   )

1

Submitted: December 7, 2023/January 4, 2024
Decided: January 9, 2024


**<u>OPINION</u>**

Christian Douglas Wright, Esq., Jameson A.L. Tweedie, Esq., Ralph K. Durstein III, Esq., Sawyer M. Traver, Esq., Deputy Attorneys General, Wilmington, DE, Victor M. Sher, Esq. (Argued), Matthew K. Edling, Esq. (Argued), Stephanie D. Biehl, Esq. (Argued), Sher Edling LLP, San Francisco, CA, *Attorneys for Plaintiff State of Delaware*

David E. Wilks, Esq., Wilks Law, LLC, Wilmington, DE, Theodore J. Boutrous, Jr., Esq. (Argued), William E. Thomson, Esq., Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Andrea E. Neuman, Esq., Dunn & Crutcher LLP, New York, NY, Thomas G. Hungar, Esq., Dunn & Crutcher LLP, Washington, DC, Joshua D. Dick, Esq., Dunn & Crutcher LLP, San Francisco, CA, *Attorneys for Defendants Chevron Corporation and Chevron U.S.A. Inc.*

Kenneth J. Nachbar, Esq., Alexandra M. Cumings, Esq., Morris Nichols Arsht & Tunnell, Wilmington, DE, Nathan P. Eimer, Esq., Pamela R. Hanebutt, Esq., Lisa S. Meyer, Esq., Eimer Stahl LLP, Chicago, IL, Robert E. Dunn, Esq. (Argued), Eimer Stahl LLP, San Jose, CA, *Attorneys for Defendants CITGO Petroleum Corporation*

Colleen D. Shields, Esq., Patrick M. Brannigan, Esq., Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE, Tristan L. Duncan, Esq., Daniel B. Rogers, Esq., William F. Northrip, Esq., Shook, Hady & Bacon L.L.P., Kansas City, MO, *Attorneys for Defendant Murphy USA Inc.*

Kevin J. Mangan, Esq., Womble Bond Dickinson (US) LLP, Wilmington, DE, Jeremiah J. Anderson, Esq. (Argued), McGuireWoods LLP, Houston, TX, Kathryn M. Barber, Esq., McGuireWoods LLP, Richmond, VA, *Attorneys for American Petroleum Institute*

Mackenzie M. Wrobel, Esq., Coleen W. Hill, Esq., Duane Morris LLP, Wilmington, DE, Michael F. Healy, Esq., Shook Hardy & Bacon LLP, San Francisco, CA, Michael L. Fox, Esq., Duane Morris LLP, San Francisco, CA, *Attorneys for Defendant OVINTIV INC.*

Daniel J. Brown, Esq., Alexandra M. Joyce, Esq., McCarter & English LLP, Wilmington, DE, Steven M. Bauer, Esq., Margaret A. Tough, Esq., Latham & Watkins LLP, San Francisco, CA, Jameson R. Jones, Esq., Daniel R. Brody, Esq., Bartlit Beck LLP, Denver, CO, *Attorneys for Defendants ConocoPhillips and ConocoPhillips Company*

Daniel J. Brown, Esq., Alexandra M. Joyce, Esq., McCarter & English LLP, Wilmington, DE, Steven M. Bauer, Esq., Margaret A. Tough, Esq., Latham & Watkins LLP, San Francisco, CA, *Attorneys for Defendants Phillip 66 and Phillips 66 Company*

Michael A. Barlow, Esq., Abrams & Bayliss LLP, Wilmington, DE, Robert P. Reznick, Esq. (Argued), Orrick, Herrington & Sutcliffe LLP, Washington, DC, James Stengel, Esq., Marc R. Shapiro, Esq., Orrick, Herrington & Sutcliffe LLP, New York, NY, Catherine Y. Lui, Esq., Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, *Attorneys for Defendant Marathon Oil Corporation*

Robert W. Whetzel, Esq., Blake Rohrbacher, Esq., Alexandra M. Ewing, Esq., Richards, Layton & Finger, P.A., Wilmington, DE, Anna Rotman, Esq. (Argued), Kirkland & Ellis LLP, Houston, TX, *Attorneys for Defendant TotalEnergies, SE*

Steven L. Caponi, Esq., Matthew B. Goeller, Esq., Megan E. O'Connor, Esq., K&L Gates LLP, Wilmington, DE, David C. Frederick, Esq., James M. Webster, III, Esq., Daniel S. Severson, Esq., Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., *Counsel for Shell plc (f/k/a Royal Dutch Shell plc) and Shell USA, Inc. (f/k/a Shell Oil Company)*

Catherine A. Gaul, Esq., Ashby & Geddes, Wilmington, DE, Nancy G. Milburn, Esq., Diana E. Reiter, Esq. (Argued), Arnold & Porter Kaye Scholer LLP, New York, NY, Jonathan W. Hughes, Esq., Arnold & Porter Kaye Scholer LLP, San Francisco, CA, John D. Lombardo, Esq., Arnold & Porter Kaye Scholer LLP, Los Angeles, CA, *Attorneys for Defendants BP America Inc. and BP p.l.c.*

Jeffrey L. Moyer, Esq., Christine D. Haynes, Esq., Richards, Layton & Finger, P.A., Wilmington, DE, Kevin Orsini, Esq., Vanessa A. Lavely, Esq., Cravath, Swaine & Moore LLP, New York, NY, *Attorneys for Defendant Occidental Petroleum Corporation*

Antoinette D. Hubbard, Esq., Stephanie A. Fox, Esq., Maron Marvel Bradley Anderson & Tardy LLC, Wilmington, DE, Shannon S. Broome, Esq., Ann Marie Mortimer, Esq., Hunton Andrews Kurth LLP, San Francisco, CA, Shawn Patrick Regan, Esq. (Argued), Hunton Andrews Kurth LLP, New York, NY, *Attorneys for*

*Defendants Marathon Petroleum Corporation, Marathon Petroleum Company LP, and Speedway LLC*

Christian J. Singewald, Esq., White and Williams LLP, Wilmington, DE, Joy C. Fuhr, Esq., Brian D. Schmalzbach, Esq., W. Cole Geddy, Esq., McGuireWoods LLP, Richmond, VA, *Attorneys for Defendant Devon Energy Corporation*

Paul D. Brown, Esq., Chipman Brown Cicero & Cole, LLP, Wilmington, DE, Tracy A. Roman, Esq. (Argued), Crowell & Moring LLP, Washington, DC, Honor R. Costello, Esq., Crowell & Moring LLP, New York, NY, *Attorneys for Defendant CONSOL Energy Inc.*

Beth Moskow Schnoll, Esq., Ballard Spahr LLP, Wilmington, DE, Noel J. Francisco, Esq., David M. Morrell, Esq. (Argued), Jones Day, Washington, DC, David C. Kiernan, Esq., Jones Day, San Francisco, CA, *Attorneys or Defendant CNX Resources Corp.*

Daniel A. Mason, Esq., Matthew D. Stachel, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, DE, Theodore V. Wells, Jr., Esq., Daniel J. Toal, Esq., Yahonnes Cleary, Esq., Caitlin E. Grusauskas, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *Attorneys for Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and XTO Energy Inc.*

Robert W. Whetzel, Esq., Richards Layton & Finger, P.A., Wilmington, DE, Patrick W. Mizell, Esq., Matthew R. Stamme, Esq., Stephanie L. Noble, Esq., Brooke A. Noble, Esq. (Argued), Vinson & Elkins L.L.P., Houston, TX, Mortimer H. Hartwell, Vinson & Elkins L.L.P., San Francisco, CA, *Attorneys for Apache Corporation*

Joseph J. Bellew, Esq., Gordon Rees Scully Mansukhani, Wilmington, DE, J. Scott Janoe, Esq. (Argued), Baker Botts L.L.P., Houston, TX, Megan Berge, Esq., Sterling Marchand, Esq., Baker Botts L.L.P., Washington, DC, *Attorneys for Defendant Hess Corporation and Defendant Murphy Oil Corporation*

**JOHNSTON, J.**

## PROCEDURAL AND FACTUAL CONTEXT

### A. ALLEGATIONS IN THE COMPLAINT

The State of Delaware ("The State") brought this action against major corporate members of the fossil fuel industry ("Defendants") for (1) negligent failure to warn, (2) trespass, (3) common law nuisance, and (4) violations of the Delaware Consumer Fraud Act.[1]

The State alleges that Defendants knew or should have known that the unrestricted production and use of fossil fuel products creates greenhouse gas pollution that causes damage to the planet, the State of Delaware, and its residents.[2] The State asserts that Defendants concealed and misrepresented their products' known dangers while promoting their use, which drove consumption leading to creating more greenhouse gas pollution and causing the climate crisis.[3]

Defendants are extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or sellers of fossil fuel products.[4] The State claims that Defendants have deceived the public and consumers about the role of their products.[5] In support of its argument, the State claims that scientific research has shown that pollution created by Defendants' products played a direct and substantial role in the rise in emissions of greenhouse gas pollution and increased

---

[1] Compl. at ¶ 13.
[2] *Id.* at ¶ 1.
[3] *Id.* at ¶ 12.
[4] *Id* at ¶ 4.
[5] *Id.*

atmospheric $CO_2$ concentrations, which has caused and will continue to cause dangerous consequences.[6]

The State alleges that Defendants had a duty to warn their consumers and the public of the consequences known for more than fifty years.[7] Instead, Defendants concealed the dangers, promoted false and misleading information, sought to undermine public support for greenhouse gas regulation, and engaged in massive campaigns to promote the use of their products at greater volumes.[8] Additionally, the State claims Defendants are responsible for causing and accelerating climate change on Earth.[9]

The Complaint contains the following allegations. Defendants' products are emitting greenhouse gases, which are byproducts of humans combusting fossil fuels to produce energy and using fossil fuels to create petrochemical products.[10] Both the annual rate and total volume of $CO_2$ emissions have increased enormously following the major uses of oil, gas, and coal; thus, the recent acceleration of fossil fuel emissions has led to an exponential increase in atmospheric concentration of $CO_2$.[11] The effects of greenhouse gases accumulating in the Earth's atmosphere include, but are not limited to: (a) warming of the Earth's average surface

---

[6] *Id.*
[7] *Id.* at ¶¶ 7–8.
[8] *Id.* at ¶ 8.
[9] *Id.* at ¶ 47.
[10] *Id.* at ¶ 49.
[11] *Id.* at ¶¶ 50, 52.

temperature; (b) sea level rise; (c) flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of severity of storm surges, saltwater intrusion, and other impacts of higher sea levels; (d) changes to the global climate, and generally toward longer periods of drought interspersed with fewer and more severe periods of precipitation, and associated impacts on the quality of water resources available to both human and ecological systems; (e) ocean acidification; (f) increased frequency and intensity of extreme weather events; (g) changes to terrestrial and marine ecosystems, and consequent impacts on the range of flora and fauna; and (h) adverse impacts on human health associated with extreme weather, extreme heat, decreased air quality, and vector-borne illnesses.[12] As such, Defendants' conduct exacerbated the climate crisis and has impacted Delaware, its communities, and its resources, and its effects will continue to increase in severity in Delaware.[13]

Defendants went to great lengths to understand and either knew or should have known about the dangers associated with the fossil fuel products.[14] The fossil fuel industry has known about the potential warming effects of greenhouse gas emissions since the 1950s through scientific reports and statements that were made publicly at organized events held by API from highly regarded people within the

---

[12] *Id.* at ¶ 55.
[13] *Id.* at ¶ 56.
[14] *Id.* at ¶ 62.

field of climate change.[15] In 1965, President Lyndon B. Johnson's Science Advisory Committee's Environmental Pollution Panel reported that a 25% increase in carbon dioxide concentrations could occur by the year 2000, causing significant global warming, the melting of the Antarctic ice cap, and rapid sea level rise.[16] The Panel claimed fossil fuels were the clearest source of the pollution.[17] In 1968, API received a report from the Stanford Research Institute endorsing President Johnson's Scientific Advisory Council's findings.[18] The State alleges that Defendants were members of API at the time, and by virtue of their membership and participation in API, either received or should have received the Stanford Research Institute reports and were on notice of those conclusions.[19]

In 1979, API and its members, including Defendants, created a Task Force, which would soon be called the Climate and Energy Task Force, to monitor and share cutting-edge climate research throughout the oil industry.[20] The Task Force discussed the requirements for a worldwide energy source changeover away from fossil fuels. Many experts relayed to the Task Force that the buildup of carbon dioxide in the Earth's atmosphere is caused by the use of fossil fuels.[21] In 1981, Exxon's Contract Research Office prepared and distributed a "Scoping Study on

---

[15] *Id.* at ¶¶ 62–72.
[16] *Id.* at ¶ 66.
[17] *Id.*
[18] *Id.* at ¶ 69.
[19] *Id.* at ¶ 71.
[20] *Id.* at ¶ 78.
[21] *Id.* at ¶¶ 80–82.

$CO_2$" to the leadership of Exxon Research and Engineering Company.[22] The study recommended that Exxon centralize its activities in monitoring and keeping the company apprised of outside research developments dealing with climate modeling and $CO_2$-induced effects.[23] The study discussed other options for reducing $CO_2$ build-up in the atmosphere and noted that capturing $CO_2$ from flue gases was possible but costly.[24]

Research done at the time warned that a large carbon dioxide build-up in the atmosphere could create catastrophic effects to land on coastal regions, temperature, biological systems, agriculture, and human health.[25] Despite the information about the threats to people and the planet posed by continued unabated use of their fossil fuel products, Defendants did not disclose the known harms associated with the extraction, promotion, and consumption of their fossil fuel products.[26] Defendants failed to mitigate or avoid the adverse impacts caused by their fossil fuel products.[27] Instead, Defendants affirmatively acted to obscure those harms and engaged in a campaign to deceptively protect and expand the use of their fossil fuel products.[28]

---

[22] *Id.* at ¶ 83.
[23] *Id.*
[24] *Id.*
[25] *Id.* at ¶ 88.
[26] *Id.* at ¶¶ 103–104.
[27] *Id.* at ¶ 103.
[28] *Id.* at ¶ 104.

The State identifies several key events during the years of 1988–1992 that allegedly prompted Defendants to change their tactics from general research and internal discussion on climate change to a public campaign aimed at deceiving consumers and the public.

(a) In 1988, National Aeronautics and Space Administration (NASA) scientists confirmed that human activities were actually contributing to global warming. On June 23rd of that year, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of the New York Times.

(b) On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other greenhouse gases. Four more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House effect." Political will in the United States to reduce anthropogenic greenhouse gas emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

(c) In December 1988, the United Nations formed the Intergovernmental Panel on Climate Change (IPCC), a scientific panel dedicated to

10

providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

(d) In 1990, the IPCC published its First Assessment Report on anthropogenic climate change, in which it concluded that (1) there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be and (2) that emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapor, will increase in response to global warming and further enhance it. The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment report.

(e) The United Nations began preparing for the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change (UNFCCC), an international environmental treaty providing protocols for future negotiations aimed at stabilizing greenhouse gas concentrations in

11

the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system.[29]

In order to prevent their profits from plummeting, the State contends that Defendants strategized and marketed with the goal of continued dependence on their products, while undermining national and international efforts to control greenhouse gas emissions.[30]

These strategies included:

a. Influencing the tenor of the climate change debate as a means to establish that greenhouse gas reduction policies;

b. Maintaining strong working relationships between government regulators and communications-oriented organizations carrying Defendants' message minimizing the hazards of the unabated use of their fossil fuel products and opposing regulation thereof;

c. Building the case for (and falsely dichotomizing) Defendants' positive contributions to a long-term approach (ostensibly for regulation of their products) as a reason for society to reject short term fossil fuel emissions regulations, and engaging in climate change science uncertainty research; and

---

[29] *Id.* at ¶ 106.
[30] *Id.* at ¶ 108.

d.  Presenting Defendants' positions on climate change in domestic and international forums.[31]

Defendants purportedly made misleading statements about climate change, the relationship between climate change and their fossil fuel products, and the urgency of the problem. These statements were in public forums through advertisements in newspapers and other media with substantial circulation in Delaware.[32]

In contrast to their public statements, Defendants' internal actions demonstrated their awareness of and intent to profit from the unabated use of fossil fuel products.[33] The State alleges that Defendants made multi-billion-dollar infrastructure investments for their operations that acknowledge the reality of coming anthropogenic climate-related change. These included raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[34]

---

[31] *Id.* at ¶ 125.
[32] *Id.* at ¶ 126.
[33] *Id.* at ¶ 142.
[34] *Id.*

Defendants' actions allegedly have exacerbated the costs of adapting to and mitigating the adverse impacts of the climate crisis.[35] Over the years greenhouse gas pollution has been accumulating in the atmosphere and does not dissipate for thousands of years.[36] Greenhouse gas pollution will continue to increase in magnitude and frequency causing an increase in magnitude and frequency of physical, environmental, economic, and social injuries.[37] Defendants have delayed efforts to prevent any more greenhouse gas emissions which has increased environmental harms and increased the magnitude and cost to address the harms that have already occurred or are locked in by previous emissions.[38] Defendants' campaign obscured the science of climate change to protect and expand the use of fossil fuels, and greatly increased and continues to increase the harm and rate of harm suffered by Delaware and its residents.[39]

Even if Defendants did not adopt technological or energy source alternatives that would have reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products, Defendants could have taken other practical, cost-effective steps to reduce the use of their fossil fuel products, reduced global greenhouse gas

---

[35] *Id.* at ¶ 148.
[36] *Id.*
[37] *Id.*
[38] *Id.* at ¶ 149.
[39] *Id.* at ¶ 150.

pollution, and mitigate the harms associated with the use and consumption of their fossil fuel products.[40] Those alternative methods include:

   a. Acknowledging and sharing the validity of scientific evidence on anthropogenic climate change and the damages it will cause people, communities, the State, and the environment. Acceptance of that evidence along with associated warnings and actions would have altered the debate from whether to combat climate change and sea level rise to how to combat it, and avoided much of the public confusion that has ensued over more than 30 years;

   b. Forthrightly communicating with Defendants' stockholders, banks, insurers, consumers, the public regulators, and the State and warning them about the global warming hazards of Defendants' fossil fuel products that were known to Defendants, which would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Defendants' products;

   c. Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public debate, and to cause many

---

[40] *Id.* at ¶ 159.

15

consumers and business and political leaders to think the relevant science was far less certain that it actually was;

d. Sharing their internal scientific research with consumers and the public, and with other scientists and business leaders, so as to increase public understanding of the scientific underpinnings of climate change and its relation to Defendants' fossil fuel products;

e. Supporting and encouraging policies to avoid dangerous climate change, and demonstrating corporate leadership in addressing the challenges of transitioning to a low-carbon economy;

f. Prioritizing alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on Defendants' hazardous fossil fuel products; and

g. Adopting their stockholders' concerns about Fossil Fuel Defendants' need to protect their businesses from the inevitable consequences of profiting from their fossil fuel products.[41]

The State asserts that Defendants continue to mislead the public about the impact of fossil fuel products on climate change, through greenwashing campaigns and other misleading advertisements in Delaware and elsewhere.[42] Defendants

---

[41] *Id.*
[42] *Id.* at ¶ 161.

have falsely claimed through their advertising campaigns that their businesses are substantially invested in lower carbon technologies and renewable energy sources.[43] In actuality, Defendants minimally invested in renewable energy while continuing to expand fossil fuel production. Defendants claim that their fossil fuel products are "green" or "clean" and that using these products will sufficiently reduce or reverse the dangers of climate change.[44] None of Defendants' fossil fuel products are "green" or "clean" because they all continue producing greenhouse gas emissions into the atmosphere, warming the planet.[45] Defendants continue to fail to inform or warn their consumers about the foreseeable effects of their fossil fuel products in causing and accelerating the climate crisis, purposefully omitting this information to the present.[46]

Defendants misleadingly represent to their consumers that the use of certain fossil fuel products actually helps reduce emissions and gain increased fuel economy creating a "green" or "greener" benefit.[47] Contrary to Defendants' "green" claims, the development, production, refining, and consumer use of their fossil fuel products increase greenhouse gas emissions to the detriment of public health and consumer welfare.[48] If consumers understood the full degree to which

---

[43] Id.
[44] Id.
[45] Id.
[46] Id. at ¶ 162–163.
[47] Id. at ¶ 204.
[48] Id.

Defendants' products contributed to climate change and that Defendants had not materially invested in alternative energy sources, consumers would not have purchased Defendants' products or would have purchased fewer products.[49] Defendants' omissions of the truth and misleading claims were part of their goal of influencing consumer demand for their fossil fuel products.[50]

The State alleges that Defendants' deceit only recently became discoverable, and their misconduct is ongoing due to these reasons: (1) Defendants' campaign of deception; (2) Defendants' efforts to discredit climate change science and create the appearance such science is uncertain; (3) Defendants' concealment and misrepresentations regarding the fact that their products, including natural gas, cause catastrophic harms; and (4) Defendants used front groups such as API, the Global Climate Coalition, and the National Mining Association to obscure their involvement in these actions.[51]

Consequently, the State argues that it has suffered, is suffering, and will continue to suffer injuries from Defendants' wrongful conduct.[52] The State alleges that Defendants' individual and collective conduct of failing to warn of the threats their fossil fuel products posed to the world's climate; promoting their fossil fuel products; concealing known hazards associated with the use of those products; and

---

[49] *Id.* at ¶ 205.
[50] *Id.* at ¶ 206.
[51] *Id.* at ¶ 219.
[52] *Id.* at ¶ 226.

designing campaigns to obscure the connection between their products and global warming and its environmental, physical, social and economic consequences—are all a direct and proximate cause that brought about or helped bring about global warming; consequent sea level rise accompanied by flooding, erosion, and loss of wetlands and beaches in Delaware; increased frequency and intensity of extreme weather events in Delaware, including coastal storms, flooding, drought, extreme heat, extreme precipitation events, and others; ocean warming and acidification; and the cascading social, economic, and other consequences of these environmental changes.[53] The State alleges that these adverse impacts will continue to increase in frequency and severity in Delaware.[54] The State further alleges that but for Defendants' conduct, the State would have suffered no, or far less, serious injuries and harms that it has endured. Such injuries foreseeably will continue, due to the climate crisis and its physical, environmental, social, and economic consequences.[55]

## B. PROCEDURAL CONTEXT

This Superior Court case was filed on September 20, 2020. On October 23, 2020, Defendants removed the action to the United States District Court for the District of Delaware. Defendants asserted numerous grounds for removal: "(1)

---

[53] *Id.*
[54] *Id.*
[55] *Id.* at ¶ 232.

federal common law, (2) *Grable* jurisdiction, (3) complete preemption by the Clean Air Act ("CAA"), (4) federal enclave jurisdiction, (5) the federal officer removal statute, 28 U.S.C. § 1442, (6) jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*, and (7) the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1453."[56]

The District Court held that "Defendants have failed to meet their burden to show that this Court may exercise jurisdiction over this case."[57] The District Court remanded the case to the Superior Court.[58] The District Court reasoned: (i) "Plaintiff's claims are not completely preempted by federal common law." The Complaint "only asserts state-law causes of action";[59] (ii) "Defendants have failed to demonstrate that a federal issue is 'necessarily raised' by Plaintiff's claims"; thus the District Court may not exercise *Grable* jurisdiction;[60] (iii) Defendants failed to show that their Outer Continental Shelf lessees are "performing a task that the federal government would otherwise be required to undertake itself;"[61] and (iv) even if Defendants could satisfy the "operation" prong of the two-part test to determine OCSLA jurisdiction, Defendants cannot satisfy the "but for" connection between the cause of action and the OCS operation because Defendants did not

---

[56] *Delaware v. BP America Inc.*, 578 F. Supp. 3d 618, 626–627 (D. Del. 2022).
[57] *Id.* at 627.
[58] *Id.*
[59] *Id.* at 628.
[60] *Id.* at 634.
[61] *Id.* at 638.

argue that Plaintiff would not have been injured "but for" Defendants' operation on the OCS.[62]

On appeal, this case was consolidated with a similar action presiding in the United States District Court for the District of New Jersey. The United States Court of Appeals for the Third Circuit affirmed the District Court of Delaware's decision, stating that there are no federal claims to be heard and there is no complete preemption.[63]

The United States Supreme Court denied Defendants' petition for writ of certiorari.[64]

Similar cases have been filed in many courts throughout the United States. Other courts have addressed issues including lack of personal jurisdiction, failure to state a claim, and anti-SLAPP laws.

In *City of New York v. Chevron Corporation*, the United States Court of Appeals for the Second Circuit held that municipalities may not utilize state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions.[65] The Second Circuit also held that the City's state-law tort claims are displaced by federal common law, and the Clean Air Act ("CAA")

---

[62] *Id.* at 639–641.
[63] *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022).
[64] *Chevron Corp. v. City of Hoboken, New Jersey*, 143 S. Ct. 2483 (2023).
[65] 993 F.3d 81, 85 (2d Cir. 2021).

displaces the City's federal common law damages claims where domestic emissions are involved.[66] The Court reasoned that regulating activities outside the State's borders is beyond the limits of state law.[67] The Court also found that, "federal judges may [not] set limits on greenhouse gas emissions in [the] face of a law empowering [the] EPA to [do] the same."[68] The CAA and authorized EPA actions displace any federal common law right to seek abatement of greenhouse gas emissions.[69]

In *City and County of Honolulu v. Sunoco LP*, the Court denied the defendants' motion to apply California's Anti-SLAPP Law. The Court reasoned, after applying a balancing test, that the factors favor applying Hawai'i law, as opposed to California's anti-SLAPP law, in Hawai'i.[70]

In *Commonwealth v. Exxon Mobil Corporation*, the Massachusetts Superior Court denied defendant's motion to dismiss for lack of personal jurisdiction and for failure to state a claim.[71] The Court reasoned that its exercise of jurisdiction over Exxon satisfied both the Massachusetts long-arm statute and the due process clause of the Fourteenth Amendment.[72] The Court also reasoned that the

---

[66] *Id.* at 89–96.
[67] *Id.* at 92.
[68] *Id.* at 95.
[69] *Id.* (citing *AEP v. Connecticut*, 564 U.S. 410, 424–429 (2011)).
[70] No. 1CCV-20-0000380, at *2–5 (Haw. Cir. Ct. Aug. 27, 2021).
[71] 2021 WL 3493456, at *1 (Mass. Super.).
[72] *Id.* at 8.

Commonwealth sufficiently alleged that Exxon engaged in deceptive practices with respect to their "greenwashing" claim.[73]

In the present action, Defendants have filed 14 motions to dismiss. The individual motions variously assert failure to state a claim, lack of personal jurisdiction, statute of limitations, insufficient service of process, and anti-SLAPP immunity.

<u>**STANDARD OF REVIEW**</u>

**MOTION TO DISMISS UNDER RULE 12(b)(6)**

A party may move to dismiss under this Court's Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[74] In deciding a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant; and (4) denies dismissal if recovery on the claim is reasonably conceivable.[75]

The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving

---

[73] *Id.* at 13.
[74] Del. Super. Ct. Civ. R. 12(b)(6).
[75] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

party."[76]  The Court also may reject "every strained interpretation of the allegations proposed by the plaintiff."[77]

Delaware's pleading standard is "minimal."[78]  Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[79]  A claim's reasonable conceivability generally cannot be determined through "matters outside the pleadings."[80]  But the Court "may consider matters outside the pleadings when the document is integral to a plaintiff's claim and incorporated into the complaint."[81]

### MOTION TO DISMISS UNDER RULE 12(b)(2)

A non-resident defendant may move to dismiss for lack of personal jurisdiction under this Court's Civil Rule 12(b)(2).[82]  "Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal

---

[76]  *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).
[77]  *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[78]  *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).
[79]  *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 2021 WL 1016442, at *3 (Del. Super. Ct. Mar. 17, 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility. . . .'").
[80]  *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).
[81]  *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (internal quotation marks omitted); *see also Malpiede*, 780 A.2d at 1083 ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").
[82]  Del. Super. Ct. Civ. R. 12(b)(2).

jurisdiction over [a non-resident] defendant."[83]  But, when Rule 12(b)(2) is invoked, the plaintiff does shoulder such a burden.[84]  When no meaningful discovery has been conducted, the plaintiff must make a *prima facie* showing that personal jurisdiction exists.[85]  In assessing the plaintiff's showing, the Court "is not limited to the pleadings and can consider affidavits, briefs of the parties, and the record as a whole."[86]  "Still, unless contradicted by affidavit, the Court must (1) accept as true all well-pleaded allegations in the complaint; and (2) construe the record in the light most favorable to the plaintiff."[87]

## ANALYSIS

### *State Law Claims and Constitutionality – Interstate Pollution*

Defendants argue that the State's claims are barred because damages caused by interstate emissions and global warming cannot be governed by State law. Defendants contend that the injuries claimed by the State were caused by emissions outside of the State. The federal Constitution prohibits the State from using its own laws to resolve claims seeking redress for injuries allegedly caused

---

[83]  *Green Am. Recycling, LLC v. Clean Earth, Inc.*, 2021 WL 2211696, at *3 (Del. Super. Ct. June 1, 2021) (alteration in original) (quoting *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 800 (Del. Ch. 2020)).

[84]  *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437–38 (Del. 2005).

[85]  *E.g.*, *Green Am. Recycling*, 2021 WL 2211696, at *3.

[86]  *Id.* (internal quotation marks omitted).

[87]  *Id.* (internal quotation marks and citations omitted); *see also Mabey v. Crystalite Bohemia, S.R.O.*, 2018 WL 775402, at *3 (Del. Super. Ct. Feb. 6, 2018) (Though entitled to favorable inferences on Rule 12(b)(2) review, "the plaintiff must plead specific facts and cannot rely on mere conclusory assertions." (internal quotation marks omitted)).

by out-of-state emissions. Defendants further assert that areas involving "uniquely federal interests" pre-empt state law resolution.

The United States Supreme Court has explained in *Boyle v. United Technologies Corp.* that:

> [W]e have held that a few areas, involving "uniquely federal interests" are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts— so-called "federal common law."[88]

The Supreme Court ruled in *American Elec. Power Co. v. Connecticut*:

> There is no federal general common law, *Erie R. Co. v. Tompkins*, famously recognized. In the wake of *Erie*, however, a keener understanding developed. . . *Erie* "le[ft] to the states what ought be left to them," and thus required "federal courts [to] follow state decisions on matters of substantive law appropriately cognizable by the states." *Erie* also sparked "the emergence of a federal decisional law in areas of national concern." The "new" federal common law addresses "subjects within national legislative power where Congress has so directed" or where the basic scheme of the Constitution so demands. Environmental protection is undoubtedly an area "within national legislative power," one in which federal courts may fill in "statutory interstices," and, if necessary, even "fashion federal law." As the Court stated in *Milwaukee I*: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law."[89]

---

[88] 487 U.S. 500, 504 (1988); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (noting that the pre-emption of state law is allowed by federal common law where the interests at stake are "uniquely federal" in nature).

[89] 564 U.S. 410, 420–421 (2011).

The CAA displaced federal common law remedies for nuisance claims seeking abatement of greenhouse gas emissions.[90]

In *International Paper Company v. Ouellette*, the Supreme Court noted:

> Although courts should not lightly infer pre-emption, it may be presumed when the federal legislation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" . . . .
>
> After examining the CWA [Clean Water Act] as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the "full purposes and objectives of Congress." Because we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause, we conclude that the CWA precludes a court from applying the law of an affected State against an out-of-state source . . . .
>
> Nothing in the Act gives each affected State this power to regulate discharges. The CWA carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source State and the EPA. This delineation of authority represents Congress' considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution. It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure.[91]

---

[90] *Id.*
[91] 479 U.S. 481, 491–494 (1987).

The Clean Water Act ("CWA") is analogous to the CAA. Following the analysis used in *Ouellette*, the source of the pollution is dispositive. These Acts establish standards implemented by Congress for balancing and regulating the interests of states invaded by pollution.

In *State ex rel. Jennings v. Monsanto Company*, polychlorinated biphenyls or "PCBs" were released into the environment. PCBs were alleged to have caused lasting damage to "public health and the State's lands and waters."[92] The State brought suit against Monsanto for public nuisance, trespass, and unjust enrichment.[93] The State alleged that Monsanto knew about the dangers of PCBs. Nevertheless, Monsanto continued to produce PCBs and misled the public about the dangers of PCBs. The Delaware Supreme Court held that the State sufficiently pled that, even though Monsanto did not control PCBs after its sale to third parties, Monsanto substantially participated in "creating the public nuisance and causing the trespass by actively misleading the public and continuing to supply PCBs to industry and consumers knowing that PCBs were hazardous, would escape into the environment after sale to third parties, and would lead to widespread and lasting contamination of Delaware's lands and waters."[94] At the motion to dismiss stage of

---

[92] 299 A.3d 372, 375 (Del. 2023).
[93] *Id.*
[94] *Id.* at 376.

28

the proceedings, the Court found that allegations of foreseeability of the dangers of PCBs were sufficient to prevent dismissal.[95]

The United States Court of Appeals for the Second Circuit states in *City of New York v. Chevron Corporation*:

> [F]ederal common law exists in only the "few and restricted" enclaves where a federal court is "compelled to consider federal questions [that] cannot be answered from federal statutes alone."[96]

The *Chevron* court recognized that "there also must be a conflict between the federal interest and the operation of state law."[97] The defendants in that case were alleged to have failed to warn and to have used deceptive marketing claims and campaigns to discredit mainstream scientific evidence. Claims requesting damages for the cumulative impact of conduct occurring simultaneously across multiple jurisdictions, such as global greenhouse gas emissions, were found to be "beyond the limits of state law."[98]

This Court finds that claims in this case seeking damages for injuries resulting from out-of-state or global greenhouse emissions and interstate pollution,

---

[95] *Id.* at 383 ("Instead, the crux of the issue is: can a product manufacturer be held liable after a product it manufactures is sold to third parties whose activities release the product into the environment and cause a public nuisance?").
[96] 993 F.3d 81, 89 (2d Cir. 2021).
[97] *Id.* at 90.
[98] *Id.* at 92.

are pre-empted by the CAA. Thus, these claims are beyond the limits of Delaware common law.

### *Clean Air Act – Delaware Source Pollution*

The United States Supreme Court has established the general rule of federal pre-emption.

> [S]tate law is pre-empted under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, in three circumstances. First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
>
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes it has emphasized: "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "'clear and manifest.'"
>
> Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[99]

The CWA cases apply by analogy to the CAA cases. In *International Paper Co. v. Ouellette*, the Supreme Court found that the CWA precludes a court from applying the law of an affected State against an out-of-state source.[100]

Similar to the CWA, the EPA has established regulations and emissions standards for the CAA. The Clean Air Act Renewable Fuel Standard Program regulates the consumption and use of fossil fuel products.

Using same analysis and reasoning that the Supreme Court used for the CWA in *Ouellette*, the CAA preempts state law to the extent a state attempts to regulate air pollution originating in other states.[101]

However, the CAA does not displace Delaware common law claims where the harm is caused by foreign global emissions. Nevertheless, there is a need for judicial caution in the face of "delicate foreign policy considerations."[102]

In *American Electric Power Company, Inc. v. Connecticut*, the United States Supreme Court held that "the Clean Air Act and the EPA actions it authorizes

---

[99] *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990).

[100] 479 U.S. 481, 493–494 (1987).

[101] *See Bell v. Cheswick Generating Station*, 734 F.3d 188, 194 (3d Cir. 2013) ("We see nothing in the Clean Air Act to indicate that Congress intended to preempt source state common law tort claims. If Congress intended to eliminate such private causes of action, 'its failure even to hint at' this result would be 'spectacularly odd.'") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 491 (1996)).

[102] *City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021).

displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants."[103] Thus, state law is not pre-empted by federal statutes (CWA and CAA) where injuries and damages result from in-state sources.[104]

Section 7401(a)(3) of title 42 of the United States Code provides:

> The Congress finds -- that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments.[105]

Section 7416(e) states:

> [N]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.[106]

---

[103] 564 U.S. 410, 424 (2011).
[104] *Id.* at 429.
[105] 42 U.S.C. § 7401.
[106] 42 U.S.C. § 7416.

There is no "field pre-emption" for source State litigation. Suits asking for State damages constitute state regulation.[107]

This Court finds that the CAA does not pre-empt state law regulation of alleged claims and damages resulting from air pollution originating from sources in Delaware. Air pollution prevention and control at the source is the primary responsibility of state and local governments.

### *Political Questions*

Defendants argue that the State is requesting the Court to resolve nonjusticiable political questions.

The U.S. Supreme Court lays out the factors to determine whether there is a political question.

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political

---

[107] *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) ("And while the common-law remedy is limited to damages, a liability award 'can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'").

decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.[108]

The Delaware Supreme Court has held that the *Baker* factors to be the standard used when addressing "political questions."[109]

In *Native Village of Kivalina v. ExxonMobil Corp.*, the City of Kivalina brought suit against multiple oil, energy, and utility companies ("Energy Producers"). Kivalina alleged that the existence of its land was threatened due to the effects of global warming, attributable to the large quantities of greenhouse gases emitted by Energy Producers.[110] Energy Producers moved to dismiss the action for lack of subject-matter jurisdiction because Kivalina's allegations raised "inherently nonjusticiable political questions because to adjudicate its claims, the court would have to determine the point at which greenhouse gas emissions become excessive without guidance from the political branches."[111] The Ninth Circuit affirmed the ruling made by the United States District Court for the Northern District of California that Kivalina lacked standing on the basis of the

---

[108] *Baker v. Carr*, 369 U.S. 186, 217 (1962).
[109] *State, ex rel. Oberly v. Troise*, 526 A.2d 898, 904 (Del. 1987); *see also Guy v. City of Wilmington*, 2020 WL 2511122, at *2 (Del. Super.).
[110] 696 F.3d 849, 853–854 (9th Cir. 2012).
[111] *Id.* at 854.

political question. Kivalina could not establish causation under Article III, deeming the issue appropriate at the discretion of the executive or legislative branch.[112]

In *People of State of California v. General Motors Corp.*, the State of California brought suit against various automakers for creating and contributing to global warming.[113] Defendants argued that the nuisance claims presented non-justiciable political questions.[114] Defendants alleged that global warming was an issue of public and foreign policy that should be addressed and resolved by the other political branches of the federal government and not by the courts.[115] The Court acknowledged that just because claims touch on "public policy, foreign policy, and political issues, it is 'tempting to jump to the conclusion that such claims are barred by the political question doctrine.'"[116] The Court stated, however, that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," and that the "justiciability inquiry is limited to 'political questions,' not . . . 'political cases,' and should be made on a 'case-by-case' basis."[117] The Court ruled that "dismissal on the basis of the

---

[112] *Id.*

[113] 2007 WL 2726871, at *1 (N.D. Cal.).

[114] *Id.* at 5.

[115] *Id.*; *see also Comer v. Murphy Oil USA, Inc.*, 839 F.Supp.2d 849, 864 (S.D. Miss. 2012) (reasonableness of greenhouse gas emissions is determined by the EPA, not by the courts); *Sagoonick v. State*, 503 P.3d 777, 795 (Alaska 2022) ("The political question doctrine maintains the separation of powers by 'exclud[ing] from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to' the political branches of government.").

[116] *Id.* at 6.

[117] *Id.*

political question doctrine is appropriate only if one of the [*Baker*] formulations is 'inextricable' from the case."[118] The Court also noted that the *Baker* tests are "more discrete in theory than in practice, with the analyses often collapsing into one another."[119]

This Court finds that the political question doctrine rarely, if ever, is applied to justify judicial abstention in Delaware. The Court finds that there is no reason to apply the doctrine in this case. Delaware courts have considered similar cases in the environmental context, or involving public nuisance product claims, without the necessity of deferring on the basis of a nonjusticiable political question.[120]

### *Public Nuisance and Trespass*

The Delaware Supreme Court recently addressed public nuisance and trespass in *State ex rel. Jennings v. Monsanto Co.*[121] *Monsanto* dealt with PCBs (polychlorinated biphenyls), chemicals that, when released into the environment, persist indefinitely.[122] The federal government discovered that exposure to PCBs causes serious health effects, which led to the banning of PCB production.[123] The

---

[118] *Id.*
[119] *Id.*
[120] *See State ex rel. Jennings v. Monsanto Co.*, 2022 WL 2663220 (Del. Super.) (dealing with PCBs); *see also Sills v. Smith & Wesson Corp.*, 2000 WL 33113806 (Del. Super.) (dealing with firearms); *see also State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382 (Del. Super.) (dealing with opioids).
[121] 299 A.3d 372 (Del. 2023).
[122] *Id.* at 375.
[123] *Id.*

State of Delaware asserted claims for public nuisance, trespass, and unjust enrichment against Monsanto.

In this case, the State's Complaint alleges five reasons Defendants created a public nuisance:

a. Controlling every step of the fossil fuel product supply chain, including the extraction of raw fossil fuel products, including crude oil, coal, and natural gas from the Earth; the refining and marketing of those fossil fuel products, and the placement of those fossil fuel products into the stream of commerce;

b. Affirmatively and knowingly promoting the sale and use of fossil fuel products that Fossil Fuel Defendants knew to be hazardous and knew would cause or exacerbate global warming and related consequences, including, but not limited to, sea level rise, drought, extreme precipitation events, and extreme heat events;

c. Affirmatively and knowingly concealing the hazards the Fossil Fuel Defendants knew would result from the normal use of their fossil fuel products by misrepresenting and casting doubt on the integrity of scientific information related to climate change;

d. Disseminating and funding the dissemination of information intended to mislead customers, consumers, and regulators regarding known and foreseeable risk of climate change and its consequences, which follow from the normal, intended use of Fossil Fuel Defendants' fossil fuel products; and

e. Affirmatively and knowingly campaigning against the regulation of their fossil fuel products, despite knowing the hazards associated with the normal use of those products, in order to continue profiting from use of those products by externalizing those known costs onto people, the environment, and communities, including residents of Delaware; and failing

37

to warn the public about the hazards associated with the use of fossil fuel products.[124]

The State argues that a defendant "can be held liable when it substantially contributed to a public nuisance by misleading the public and selling a product it knew would eventually cause a safety hazard and end up contaminating the environment for generations when used by industry and consumers."[125] Thus, Defendants contributed to a public nuisance because they misled the public and sold their fossil fuel products, knowing that the products would continue to cause harm to the environment through the emission of greenhouse gases into the atmosphere.

In *Monsanto*, the State alleged that the defendants supplied toxic substances, *i.e.,* PCBs, and knew that the PCBs would be released into the environment, which would cause pollution. Defendants purportedly misled the public and the government about the safety of PCBs and substantially participated in carrying on public nuisance, resulting in damages.

The Delaware Supreme Court held that the State failed to state a claim for unjust enrichment and for trespass to lands that the State holds in public trust. However, the State successfully stated a claim for public nuisance and for trespass

---

[124] Compl. at ¶ 257.
[125] Pl.'s Answering Brief in Opposition to Defs. Joint Motion to Dismiss for Failure to State a Claim at 26 (quoting *Monsanto*, 2023 WL 4139127, at *8).

to lands that the State owns directly.[126] The Court reasoned that even if Monsanto did not control the PCBs after its sale to third parties, Monsanto was still part of the process of releasing PCBs into the environment, creating a claim for public nuisance and trespass.[127]

This Court finds that *Monsanto* controls. At this stage in the proceedings, the State has stated a general claim for environmental-based public nuisance and trespass for land the State owns directly, but not for land the State holds in public trust. Control of the product at the time of alleged nuisance or trespass is not an element of a nuisance claim.[128]

However, unlike contamination of land and water in *Monsanto*, damages caused by air pollution limited to State-owned property may be difficult to isolate and measure. Nevertheless, that is an issue to be addressed at a later stage of the case. This should not be a reason to grant dismissal of nuisance and trespass claims at this time.

### Rule 9(b) Particularity

The Superior Court Rules of Civil Procedure Rule 9(b) provides:

> In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be

---

[126] *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 392 (Del. 2023).
[127] *Id.* at 376.
[128] *Id.* at 383.

stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Rule 9(b) applies to claims averring fraud.

> Although the language of Rule 9(b) confines its requirements to claims of mistake and fraud, the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud. Rule 9(b)'s requirements have been found to apply to claims for misrepresentation, conspiracy to commit fraud, and negligent misrepresentation.[129]

Rule 9(b) applies to tort claims based on fraud or intentional misrepresentations.

## BP's Argument

BP America Inc. ("BP") makes three arguments. First, the State affirmatively pled in their Complaint that BP publicly acknowledged the risk of climate change—and its link to fossil fuels—decades ago.[130] BP allegedly never denied the dangers of their fossil fuel products. The State did not identify any "climate-denial" misrepresentations BP made to consumers and the public.[131]

Second, the State's "greenwashing" theory fails to state a claim against BP because the statements made by BP are "classic examples of non-actionable puffery and/or statements of opinion."[132] Additionally, BP alleges that the

---

[129] *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993).
[130] Def. BP P.L.C. and BP America Inc.'s Motion to Dismiss for Failure to State a Claim at 5–6.
[131] *Id.*
[132] *Id.* at 7.

statements at issue do not address "merchandise," as the Delaware Consumer Fraud Act ("DCFA") requires in 6 Del. C. § 2513.[133] As defined in 6 Del. C. § 2511: "Merchandise" means any objects, wares, goods, commodities, intangibles, real estate or services.[134] BP sells "merchandise," as described in the statute, such as retail gasoline and lubricant products throughout Delaware. However, none of the purported "greenwashing" statements in the Complaint refer to BP gasoline or lubricants.[135]

Third, the State has misrepresented the statements about Invigorate gasoline and BP Diesel.[136] BP provided their complete statements about Invigorate gasoline and BP Diesel and compared them with the State's allegations.[137] BP argues that the statements about Invigorate gasoline and BP Diesel say nothing about the environment or climate change.[138] Instead, BP argues the statements focus on eliminating dirt in the engine and using low-sulfur fuels, not on the reduction of greenhouse gas emissions that benefit the environment.[139]

---

[133] *Id.* at 9.
[134] Del. Code Ann. Tit. 6, § 2511(6).
[135] Def. BP P.L.C. and BP America Inc.'s Motion to Dismiss for Failure to State a Claim at 9–10.
[136] *Id.* at 10.
[137] *Id.* at 10–11.
[138] *Id.* at 11.
[139] *Id.* at 11–12.

## CITGO's Argument

CITGO Petroleum Corporation ("CITGO") argues that the State made vague allegations that fail to specify what facts CITGO supposedly misrepresented, when it did so, or where, as required by Rule 9(b).[140] CITGO asserts that the State fails to identify a specific statement made by CITGO and cannot simply rely on a group pleading to state a claim.[141] CITGO contends that any attempt to hold CITGO or Murphy USA, members of API, liable for API's speech fails for two reasons.[142] First, the Complaint does not allege any actionable misrepresentations by API, much less with particularity, in Delaware or elsewhere.[143] Second, the Complaint does not allege any facts suggesting a basis for holding CITGO or Murphy USA liable for the protected statements made by API or its members.[144]

CITGO provides three circumstances in which a defendant can be liable for harm resulting to a third person from the tortious conduct of another: the defendant

> (a) does a tortious action in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[145]

---

[140] Def. CITGO Petroleum Corp.'s and Murphy USA Inc.'s Motion to Dismiss for Failure to State a Claim at 11.
[141] *Id.* at 10.
[142] *Id.* at 12.
[143] *Id.*
[144] *Id.*
[145] *Id.* at 12–13 (citing Restatement (Second) of Torts §876 (1979)).

CITGO argues that the State fails the first category because although CITGO and Murphy USA were members of API, mere membership in a trade association is not sufficient to give rise to an inference of conspiracy, absent proof of "knowing participation" in the wrongful conduct.[146] CITGO argues that the State never alleged that CITGO or Murphy USA knowingly participated in any alleged misconduct.[147]

CITGO contends that the State fails the second category because CITGO and Murphy USA are not alleged to have been encouraged or aware of any advocacy messaging that API or any other Defendants communicated.[148] CITGO argues that the Complaint fails to allege that CITGO or Murphy USA supported or knew about any "greenwashing" statements, or that they were members of API when those statements were made.[149]

CITGO asserts that the State fails the third category because the Complaint does not allege that CITGO or Murphy USA made any misrepresentation that could be considered breach of duty; nor does the Complaint allege that CITGO or Murphy USA provided any assistance to API or any other Defendant in accomplishing a tortious result.[150] CITGO argues that the mere fact of membership

---

[146] *Id.* at 13 (citing *In re Asbestos Litig.*, 509 A.2d 1116, 1120 (Del. Super. 1986).
[147] *Id.* at 13.
[148] *Id.* at 15.
[149] *Id.*
[150] *Id.* at 16.

in an association is not a sufficient basis for the tort liability of individual members for the wrongful acts or omissions of an association.[151]

## CNX's Argument

CNX Resources Corporation ("CNX") argues that only two paragraphs in the Complaint mention CNX. Neither paragraph identifies a specific misstatement made by CNX.[152] CNX asserts that because the Complaint never alleged that CNX made "any statements about its products' connection to global climate change—much less any misrepresentations that could have deceived consumers—the Complaint falls well short of Rule 9(b)'s requirement to specify the time, place, and contents of the alleged misrepresentations."[153] CNX argues that "only the speaker who makes a false representation is accountable for it."[154] The State's only allegation is membership. However, none of the Defendants' alleged misstatements are attributable to CNX.[155]

## Marathon Petroleum Corporation's Argument

Marathon Petroleum Corporation ("MPC") argues that the State's Complaint failed to allege facts that would suffice to establish reasonable reliance or to show

---

[151] *Id.* (citing 62 A.L.R. 3d 1165 §4).
[152] Def. CNX Resources Corp.'s Motion to Dismiss for Failure to State a Claim at 8.
[153] *Id.* at 9.
[154] *Id.* at 10 (quoting *In re Swervepay Acquisition, LLC*, 2022 WL 3701723, at *9 (Del. Ch. 2022).
[155] *Id.*

injury caused by MPC, MPCLP, or Speedway.[156] MPC also argues that the Complaint failed to identify anyone who relied on or acted upon its advertisements or statements.[157]

MPC argues that the Complaint identifies only one specific statement made by MPC, MPCLP, or Speedway in 2018 from its Climate Perspectives report to shareholders—that the company had "invested billions of dollars to make our operations more energy efficient [and] reduce our emissions."[158] MPC argues that the Complaint does not provide facts showing how the 2018 statement was a "misrepresentation," "fraud," or "deception" upon consumers.[159] Further, the Complaint does not allege that the statement would lead "consumers to believe that purchasing and using oil and gasoline from MPC affiliates for consumer needs would lead to consumers generating fewer emissions from their own use than they would have expected had they not seen such a statement."[160]

**Apache's Argument**

Apache Corporation ("Apache") argues that all of the State's allegations that could relate to Apache are non-specific and directed in a generalized fashion

---

[156] Def. Marathon Petroleum Corp.'s, Marathon Petroleum Comp. LP's, and Speedway LLC's Motion to Dismiss for Failure to State a Claim at 9.
[157] *Id.*
[158] *Id.* at 8.
[159] *Id.*
[160] *Id.*

45

towards all Defendants.[161] Apache contends that the State relies exclusively on group pleading for its claims against Apache.[162] The State's allegations span over seventy years, and the Complaint did not put Apache on notice since the Complaint did not specify which conduct or statements made was by Apache during that time period.[163]

Apache further argues that even if Apache were a member of API, API's alleged conduct cannot be imputed to Apache.[164] The Restatement (Second) of Torts limits the circumstances in which a defendant can be held liable for harm resulting to a third person from the tortious conduct of another.[165] The State has not pled facts to support any of those circumstances.[166]

Apache relies on unique facts. The State alleges that "Apache Corporation is a publicly traded Delaware corporation with its principal place of business in Houston, Texas."[167] The State does not state any other Delaware contact. The State alleged that Apache made statements in and outside of Delaware regarding their campaign of deception and thus failed to warn consumers about global warming

---

[161] Def. Apache Corp.'s Motion to Dismiss for Failure to State a Claim at 8–9.
[162] *Id.* at 11.
[163] *Id.*
[164] *Id.* at 13.
[165] *Id.*
[166] *Id.* at 14.
[167] Compl. at ¶ 33.

hazards when marketing, advertising, and selling their product.[168] However, there was no specific description of Apache's promotional activities.

## CONSOL's Argument

CONSOL Energy Inc. ("CONSOL") is the only coal company defendant.[169] CONSOL argues that the Complaint contains boilerplate conclusory statements that are asserted against all Defendants, which fail to identify a single decision or communication CONSOL made regarding misrepresentation, fraud, or deception of climate change, greenhouse gas emissions, and fossil fuel products.[170] CONSOL asserts that the State alleged no misrepresentations made by CONSOL.[171]

## Hess's Argument

Hess Corporation ("Hess") makes four arguments: (1) Count IV of the State's Complaint is devoid of any specific allegations regarding Hess; (2) the State cannot allege such conduct because by the relevant time, Hess had ceased all oil and gas product-related commercial activity directed towards consumers in Delaware, including any advertising and/or marketing; (3) any conduct by Hess outside the State of Delaware within the five-year statute of limitations period cannot form the basis of a Delaware Consumer Fraud Act (DCFA) claim; and (4)

---

[168] *Id.*
[169] Def. CONSOL Energy Inc.'s Motion to Dismiss for Failure to State a Claim at 3.
[170] *Id.*
[171] *Id.* at 8.

any discussion of tolling or concealment of the statute of limitations by the State is unavailing.[172]

Hess argues that it divested all of its retail marketing assets in Delaware by September 30, 2014.[173] Since that time, Hess has not advertised or marketed oil and gas products to Delaware consumers, nor has not sold any oil and gas products to Delaware consumers.[174] Thus, the State has no claim against Hess because the State fails to allege any actions by Hess in violation of the DCFA within the five-year statute of limitations.[175]

## Marathon Oil Corp.'s Argument

Marathon Oil Corporation ("Marathon") argues that not one of the allegations made by the State identifies Marathon specifically, much less identifies any particularized misstatement or omission that allegedly would support liability.[176] The State failed to put Marathon on notice of its alleged misconduct.[177] Marathon argues that the State tries to "cover-up" this deficiency by claiming "greenwashing."[178] Marathon argues that the Complaint makes clear that it relates

---

[172] Def. Hess's Supplemental Motion to Partially Dismiss for Failure to State a Claim on Statute of Limitations Grounds at 8.
[173] *Id.* at 11.
[174] *Id.*
[175] *Id.* at 11–12.
[176] Def. Marathon Oil Corp.'s Motion to Dismiss at 9.
[177] *Id.* at 11.
[178] *Id.*

to Marathon Petroleum Corporation, which is not affiliated with Marathon Oil Corporation (they are two different and separate entities).[179]

*     *     *

This Court finds that the State has failed to specifically identify alleged misrepresentations for each individual defendant. All claims alleging misrepresentations, including "greenwashing", must be dismissed, with leave to amend with particularity, pursuant to Rule 9(b).

### *Failure to Warn*

The State argues that Defendants failed to warn by making misrepresentations about climate change and attempting to indirectly induce Delaware consumers to buy their fossil fuel products.[180] Defendants "had a duty to warn both consumers and bystanders that would foreseeably be harmed by the intended use of their products, and because [Defendants] made sure the dangers of their products were neither open nor obvious through their pervasive climate-disinformation campaigns."[181]

Under Section 388 of the Restatement (Second) of Torts and Delaware law, a manufacturer has a duty to warn users of the dangerous nature of its products.

---

[179] *Id.*
[180] Pl.'s Answering Brief in Opposition to Defs. Joint Motion to Dismiss for Failure to State a Claim at 53.
[181] *Id.* at 39.

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

This duty extends not only to those for whose use the chattel is supplied but also to third parsons whom the supplier should expect to be endangered by its use, which may include persons who have no connection with the ownership or use of the chattel itself. The manufacturer's duty is dependent on whether it had knowledge of the hazards associated with its product. The standard for determining the duty of a manufacturer to warn is that which a reasonable (or reasonably prudent) person engaged in that activity would have done, taking into consideration the pertinent circumstances at that time. And even where that knowledge exists, liability is imposed only where the manufacturer had no reason to think that the users of its products would recognize the danger, and it fails to exercise reasonable care in warning users of the product's dangerous nature.[182]

The State argues that Defendants had a duty to warn because they knew or had reason to know that their fossil fuel products were causing harm to their consumers and to the State.[183] The State also argues that it is an injured bystander.

---

[182] *Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1278–1279 (Del. 2018) (citing Restatement § 388) (quotes omitted).

[183] Pl.'s Answering Brief in Opposition to Defs. Joint Motion to Dismiss for Failure to State a Claim at 42.

Foreseeable bystanders need to be protected as well.[184] Courts have recognized that "bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable."[185]

In response, Defendants argue that there is "no duty to warn of or protect invitees from an open and obvious danger."[186] Defendants allege that the State's own allegations in the Complaint admit that the potential dangers of fossil fuel use on the climate have been "open and obvious" for decades.[187] Thus, Defendants had no duty to warn about these dangers, and the negligent failure to warn claims fail as a matter of law.[188]

The Court finds that the State has stated a claim for failure to warn. The State has alleged that Defendants knew that their products were endangering the environment, and harming their consumers and the State of Delaware (a valid bystander). However, the question of whether the danger was open and obvious is not appropriate for resolution at the dismissal stage.

### *Delaware Consumer Fraud Act*

Section 2513(a) of title 6 of the Delaware Code provides:

---

[184] *Id.* at 40.
[185] *Elmore v. Am. Motors Corp.*, 70 Cal. 2d 578, 586 (1969); *see also Prosser & Keeton on Torts* § 100, pp. 703–704 (5th ed. 1984).
[186] Defs. Joint Opening Brief in Support of Motion to Dismiss for Failure to State a Claim at 56 (quoting *Jones v. Clyde Spinelli, LLC*, 2016 WL 3752409, at *2 (Del. Super.)).
[187] *Id.* at 57.
[188] *Id.* at 57–58.

> The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice.

The Delaware Supreme Court has held:

> [T]o bring a private cause of action for damages under the Delaware Act, a plaintiff must allege three elements: (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a "victim" of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss.[189]

The State alleges that Defendants' deceptive statements about climate change are actionable because a jury could reasonably conclude that Defendants sought to indirectly induce consumers to purchase their fossil fuel products.[190] The State asserts that the CFA claim is timely because Defendants' fraudulent concealment of their unlawful conduct tolled the statute of limitations until the State could reasonably have discovered their conduct.[191]

Section 2506 of title 6 of the Delaware Code provides:

> Notwithstanding any other statute to the contrary, no action at law by the Attorney General brought under this chapter shall be

---

[189] *Teamsters Loc. 237 Welfare fund v. AstraZeneca Pharms. LP*, 136 A.3d 688, 693 (Del. 2016).
[190] Pl.'s Answering Brief in Opposition to Def's. Joint Motion to Dismiss for Failure to State a Claim at 48.
[191] *Id.*

initiated after the expiration of 5 years from the time the cause of action accrued.[192]

The Delaware Supreme Court has held that a "cause of action 'accrues' . . . at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[193]

The State contends that Defendants' deception began in 1988.[194] The State alleges that there was no inquiry or actual notice to investigate the Defendants' campaign of deception because Defendants were so effective at concealing their lies from the public.[195] Defendants assert that the State did have inquiry or actual notice. There were reports and stories in *The Washington Post* and *The New York Times* that warned the public about global warming and the deception used by oil and coal industries.[196] The highly-publicized *Kivalina* lawsuit, which was filed in 2008, included many of the same allegations that the State of Delaware makes.[197]

Defendants have provided evidence showing that the general public had knowledge of or had access to information about the disputes, regarding the existence of climate change and effects, decades prior to the expiration of the five-year limitations period. This information and evidence is unrefuted by the State.

---

[192] 6 *Del. C.* § 2506.
[193] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).
[194] Compl. at ¶ 106.
[195] *Id.* at ¶ 276.
[196] Defs. Motion to Dismiss for Lack of Personal Jurisdiction at 61–62.
[197] *Id.* at 62.

This Court finds that the DCFA claims are barred by the five-year statute of limitations. Tolling does not apply.

### *Personal Jurisdiction*

There are two types of personal jurisdiction—general jurisdiction and specific jurisdiction.

A court may assert general personal jurisdiction over an individual where the individual is domiciled and over a corporation where the corporation is regarded "at home."[198] An incorporated business entity is "at home" in its state of incorporation and the place of its principal place of business. Where a corporation's affiliations with the State are continuous and systematic, the entity essentially is at home in the forum State.[199]

Specific jurisdiction is "triggered when the plaintiff's claims arise out of acts or omissions, by the defendant, that take place in Delaware."[200] In other words, personal jurisdiction is based on "whether a cause of action arises from [a defendant's] contacts with the forum."[201]

Six Defendants—BP P.L.C., Chevron U.S.A. Inc., Exxon Mobil Corporation and ExxonMobil Oil Corporation, Shell PLC (f/k/a Royal Dutch Shell PLC),

---

[198] *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1780 (2017).
[199] *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014).
[200] *Ross v. Earth Movers, LLC*, 288 A.3d 284, 294 (Del. Super. 2023).
[201] *Otto Candies, LLC v. KPMG LLP*, 2017 WL 3175619, at *4 (Del. Super.).

TotalEnergies SE and TotalEnergies Marketing USA, Inc., and American petroleum Institute ("API")—argue that they are not subject to either general or specific jurisdiction in Delaware. The State conceded that none of these Defendants are incorporated or headquartered in Delaware.[202] These Defendants assert that they are not subject to specific jurisdiction in Delaware because the State's claims do not arise out of or relate to Defendants' alleged contacts with Delaware; Defendants were not on "clear notice" that personal jurisdiction would exist in Delaware for suits based on global climate change; and exercising personal jurisdiction over Defendants would be unreasonable and conflict with federalism principles.

The State alleges that Chevron Corporation is incorporated in Delaware, but that Chevron U.S.A. Inc. is incorporated in Pennsylvania with its principal place of business located in San Ramon, California.[203] Chevron U.S.A. Inc. is a wholly-owned subsidiary of Chevron Corporation and purportedly acts on Chevron Corporation's behalf and subject to Chevron Corporation's control.[204] The State further alleges that Chevron advertises in Delaware, does business in Delaware, and has owned and operated a refinery in Delaware.[205]

---

[202] Def's. Motion to Dismiss for Lack of Personal Jurisdiction at 12.
[203] *Id.* at 17.
[204] *Id.*
[205] *Id.* at 18–19.

55

The State alleges that Royal Dutch Shell PLC is incorporated in England and Wales with its headquarters and principal place of business in The Hague, Netherlands. Shell Oil Company is a wholly-owned subsidiary of Royal Dutch Shell PLC incorporated in Delaware that purportedly acts on Royal Dutch Shell PLC's behalf.[206] The State further alleges that Shell advertises in Delaware, does business in Delaware, has owned and operated a refinery in Delaware, and conducts and controls fossil fuel sales at gas stations throughout Delaware.[207]

In *Commonwealth v. Exxon Mobil Corporation*, the Superior Court of Massachusetts found that Exxon sold gasoline in Massachusetts, put up signs at its fuel stations in Massachusetts without disclosing the dangers of climate change, and alleged false and misleading statements in Massachusetts through "greenwashing."[208] The Court found personal jurisdiction proper under the Massachusetts long-arm statute and due process clause. The Court reasoned that Exxon's deception arose from Exxon's contacts with Massachusetts because "Massachusetts investors would not have purchased or retained Exxon's stocks but for its misrepresentations and omissions concerning the risk of climate change to its business."[209] That consumer deception arose from Exxon's advertisements through its Massachusetts franchisees. Massachusetts consumers were injured by

---

[206] *Id.* at 37,39.
[207] *Id.* at 40–42.
[208] 2021 WL 3493456 (Mass. Super.).
[209] *Id.* at 6.

their purchase in Massachusetts of "dangerous" fossil fuel products. The injuries "would not have occurred 'but for' Exxon's failure to disclose additional and allegedly relevant information about those products at its franchise stations."[210] The Court found that the exercise of personal jurisdiction over Exxon comported with the requirements of due process because: (1) Exxon purposefully availed itself of the privilege of conducting business activities in Massachusetts; (2) the claims arose out of Exxon's contacts with Massachusetts; and (3) the exercise of personal jurisdiction over Exxon did not offend "traditional notions of fair play and substantial justice."[211]

In this case, Defendants advertised in Delaware. The State alleges that these advertisements contained misstatements regarding climate change. However, the Complaint fails to identify specific alleged misrepresentations made in Delaware.

The U.S. Supreme Court noted in *Goodyear Dunlop Tires Operations, S.A. v. Brown*:

> When a defendant's act outside the forum causes injury in the forum, by contrast, a plaintiff's residence in the forum may strengthen the case for the exercise of specific jurisdiction.[212]

*Goodyear* involved a wrongful death action. A defective tire manufactured in Turkey, at the plant of a foreign subsidiary of The Goodyear Tire and Rubber

---

[210] *Id.* at 7.
[211] *Id.* at 7–8.
[212] 564 U.S. 915, 929 n.5 (2011).

Company, was involved in the accident.[213] An action was commenced in North Carolina against Goodyear, and three of its subsidiaries organized and operated in Turkey, France, and Luxembourg.[214] Goodyear had plants in North Carolina that regularly engaged in commercial activity.[215] Goodyear did not contest the North Carolina court's jurisdiction. However, Goodyear's foreign subsidiaries did.[216] The U.S. Supreme Court ruled that jurisdiction over claims unrelated to the sales were not sufficient.

The U.S. Supreme Court held in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*:

> [C]ausation-only approach finds no support in this Court's requirement of a "connection" between a plaintiff's suit and a defendant's activities . . . we have never framed the specific jurisdiction inquiry as always requiring proof of causation— *i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.[217]

The Court finds that there must be a connection between Delaware-specific conduct and the alleged harm. There is no need to prove geo-located causation.[218] However, there must be a relationship between Delaware activities and the cause of action and alleged damages. Advertising, selling products, operating gas

---

[213] *Id.* at 918.
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] 141 S. Ct. 1017, 1026 (2021).
[218] *Id.*

stations, and/or operating a refinery in Delaware are connections sufficient to survive dismissal. The State has alleged relationships for the six moving Defendants, sufficient to demonstrate specific personal jurisdiction.[219]

### *Anti-SLAPP*

The State alleges that Chevron and American Petroleum Institute have known for more than sixty years that fossil fuels create greenhouse gas pollution, causing detrimental effects to the planet and people.[220] Despite knowing these facts, Defendants have deceived consumers through strategic wordings in advertisements that concealed, discredited, and/or misrepresented information concerning the dangers of fossil fuel consumption.[221] The State contends that Defendants used this deception to influence consumers to continue using fossil fuel products to increase sales and protect their profits.[222] The deception continues to the present. Defendants have significantly increased greenhouse gas pollution and have substantially contributed to climate change and its adverse effects in Delaware.[223]

---

[219] *See City and County of Honolulu v. Sunoco LP*, 2023 WL 7151875, at *16 (Haw.).
[220] Pl.'s Answering Br. in Opp. to Chevron Corporation and Chevron U.S.A. Inc's Anti-SLAPP Special Mot. to Dismiss at 2–3; Pl.'s Answering Br. in Opp. to American Petroleum Institute's Mot. to Dismiss under the District of Columbia's Anti-SLAPP Statute at 2–3.
[221] *Id.* at 3.
[222] *Id.*
[223] *Id.* at 3–4.

The First Circuit Court of the State of Hawai'i denied Chevron Defendants' Special Motion to Strike and/or Dismiss the Complaint Pursuant to California's Anti-SLAPP Law. The denial was based on a balancing test.[224] The Court found that many of the factors weigh in favor of applying Hawai'i law over California's anti-SLAPP law in Hawai'i.[225] California's anti-SLAPP law may not protect the defendant if a similar suit were brought in California by a California municipality.[226] The Court reasoned that California Civil Codes § 425.16(d) and § 731 "indicate that city public nuisance actions are not protected by the anti-SLAPP law."[227] Although the language can be parsed and distinguished, public enforcement actions should not be overly constrained by the anti-SLAPP provisions.[228]

The Court reasoned that anti-SLAPP law is not intended to deal with judicial abuses in other jurisdictions. The Court noted that "different states' laws can apply to different issues in the same case."[229] Nevertheless, "It does not dictate any particular choice of law result," since a court must weigh and balance multiple factors.[230]

---

[224] *City & Cnty. Of Honolulu v. Sunoco LP*, No. 1CCV-20-0000380, at *2 (Haw. First Cir. Ct. Aug. 27, 2021).
[225] *Id.*
[226] *Id.* at 3.
[227] *Id.*
[228] *Id.*
[229] *Id.* at 5.
[230] *Id.*

The Court finds that it is unclear whether anti-SLAPP laws apply only to District of Columbia and California speech depending on the facts of the case. The Court declines to resolve this issue at this time based on a limited record. Thus, there is no basis for awarding attorneys' fees to API.

### *API – Delaware Consumer Fraud Act*

API argues that the First Amendment protects API's speech and the State's Delaware Consumer Fraud Act claim does not apply. API contends that their speech is protected noncommercial speech.[231] API argues that the State cannot demonstrate any compelling state interest. API's noncommercial speech does not contain content-based discrimination.

The State alleges that three statements show a connection between API's speech and a commercial interest:

> (1) API's "Power Past Impossible" campaign told Americans that the petroleum industry could help them live better lives—a public statement about community well-being;
>
> (2) API's internet messaging described "5 Ways We're Helping to Cut Emissions" and "4 Ways We're Protecting Wildlife—a public commentary on health or safety and the environment; and
>
> (3) API made statements on Facebook that the oil and gas industry has reduced emissions and can tackle climate change and meet the world's energy needs by embracing new

---

[231] Def. American petroleum Institute's Motion to Strike and/or Dismiss the Complaint Under the District of Columbia's Anti-SLAPP Statute at 10.

innovations together—a public expression about environmental and societal issues.[232]

API argues that their statements do not constitute commercial speech. API only made those statements, exercising its rights of advocacy on issues of public interest.[233] Because API does not produce or sell any fossil fuel, API's purpose was to comment on matters of public significance.[234]

The U.S. Supreme court has ruled:

> We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech . . . Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.[235]

The State argues that API used deceptive campaigns by means of "greenwashing" to mislead the general public about hazards of fossil fuel consumption and purposefully spreading deceptive information about the dangers of fossil fuel.[236] The claim does not violate the First Amendment because API's speech constitutes commercial speech. API's advertisements are false and misleading messages with the goal to increase the sale of fossil fuel products,

---

[232] *Id.* at 6–7.
[233] *Id.* at 7.
[234] *Id.*
[235] *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 68 (1983).
[236] Pl. Answering Brief in Opposition to Def. American Petroleum Institute's Motion to Strike and/or Dismiss the Complaint Under the District of Columbia's Anti-SLAPP Statute at 21.

62

which would not be entitled to constitutional protection afforded to noncommercial speech.[237]

This Court finds that there is a difference between misrepresentation and puffery. However, the determination of whether "statements are actionable misrepresentations or inactionable puffery is not appropriate at a motion to dismiss stage."[238] The issue of commercial speech, as opposed to misleading statements, involves a fact-intensive analysis. It is inappropriate for resolution on this motion to dismiss.

### *TotalEnergies – Motion to Dismiss*

TotalEnergies SE ("TotalEnergies") argues that TotalEnergies should be dismissed from the suit for three reasons:

> First, Plaintiff fails to allege sufficient facts upon which this Court may exercise personal jurisdiction over TotalEnergies. Nor can it because TotalEnergies does not engage in any persistent course of conduct in Delaware, either on its own, through its indirect Delaware subsidiary, TotalEnergies Marketing USA, Inc. ("TEMUSA"), or through any alleged co-conspirators. Second, the exercise of personal jurisdiction over TotalEnergies, a foreign corporation based in France, would offend constitutional due process. Lastly, Plaintiff failed to make effective service on TotalEnergies, which is a threshold jurisdictional requirement.[239]

---

[237] *Id.* at 24 – 25 (quoting *Bolger*, 463 U.S. at 68 (1983)).
[238] *See Commonwealth v. Exxon Mobil Corp.*, 2021 WL 3493456, at *13 (Mass. Super. 2021); *see also NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 172 (D. Mass. 2010) ("Courts vary in their conclusion of just where the line between misrepresentation and puffery lies, and often the determination is highly fact-specific.").
[239] Def. TotalEnergies SE's Motion to Dismiss at 1.

TotalEnergies alleges that it has no Delaware contacts. TotalEnergies is a French energy conglomerate, with its headquarters in Courbevoie, France.[240] TotalEnergies maintains no offices in Delaware, owns no property in Delaware, and makes no purposeful attempts to solicit or do business in Delaware.[241]

TotalEnergies alleges that the State cannot show that Delaware has jurisdiction over TotalEnergies under its long-arm statute.[242] The State has not pled any facts that demonstrate TotalEnergies had continuous or substantial contacts with Delaware. [243]

Section 3104(e) of title X of the Delaware Code provides:

> Proof of service outside this State may be made by affidavit of the individual who made the service or in the manner provided or prescribed by the law of this State, the order pursuant to which the service is made, or the law of the place in which the service is made for proof of service in an action in any of its courts of general jurisdiction. When service is made by mail, proof of service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the court.[244]

TotalEnergies also argues that the State failed to meet the jurisdictional requirement for proper service of process.[245] Totalenergies argues that the State's

---

[240] *Id.* at 6.
[241] *Id.*
[242] *Id.* at 5.
[243] *Id.*
[244] Del. Code Ann. Tit. 10, § 3104(e).
[245] *Id.* at 17.

proof of service did not include a receipt signed by TotalEnergies, and there is no evidence of personal delivery to any addressee.[246]

This Court finds that TotalEnergies must be dismissed for failure to be served with process.

## CONCLUSION

This Court finds that claims in this case seeking damages for injuries resulting from out-of-state or global greenhouse emissions and interstate pollution, are pre-empted by the CAA. Thus, these claims are beyond the limits of Delaware common law.

This Court finds that the CAA does not pre-empt state law regulation of alleged claims and damages resulting from air pollution originating from sources in Delaware. Air pollution prevention and control at the source is the primary responsibility of state and local governments.

This Court finds that the political question doctrine rarely, if ever, is applied to justify judicial abstention in Delaware. The Court finds that there is no reason to apply the doctrine in this case. Delaware courts have considered similar cases in the environmental context, or involving public nuisance product claims, without deferring on the basis of a nonjusticiable political question.

---

[246] Def. TotalEnergies SE's Motion to Dismiss at 18.

65

This Court finds that *Monsanto* controls. At this stage in the proceedings, the State has stated a general claim for environmental-based public nuisance and trespass for land the State owns directly, but not for land the State holds in public trust. Control of the product at the time of alleged nuisance or trespass is not an element of a nuisance claim. The State is alleging environmental harms causing damage to the public. However, unlike contamination of land and water in *Monsanto*, damages caused by air pollution limited to State-owned property may be difficult to isolate and measure. Nevertheless, that is an issue to be addressed at a later stage of the case. This should not be a reason to grant dismissal of nuisance and trespass claims at this time.

This Court finds that the State has failed to specifically identify alleged misrepresentations for each individual defendant. All claims alleging misrepresentations, including "greenwashing", must be dismissed, with leave to amend with particularity, pursuant to Rule 9(b).

The Court finds that the State has stated a claim for failure to warn. The State has alleged that Defendants knew that their products were endangering the environment, and harming their consumers and the State of Delaware (a valid bystander). However, the question of whether the danger was open and obvious is not appropriate for resolution at the dismissal stage.

This Court finds that the DCFA claims are barred by the five-year statute of limitations. Tolling does not apply.

66

The Court finds that there must be a connection between Delaware-specific conduct and the alleged harm. There is no need to prove geo-located causation.[247] However, there must be a relationship between Delaware activities and the cause of action and alleged damages. Advertising, selling products, operating gas stations, and/or operating a refinery in Delaware are connections sufficient to survive dismissal. The State has alleged relationships for the six moving Defendants, sufficient to demonstrate specific personal jurisdiction.[248]

This Court declines to resolve the Anti-SLAPP issue at this time based on a limited record. Thus, there is no basis for awarding attorneys' fees to API.

This Court finds that there is a difference between misrepresentation and puffery. The issue of commercial speech, as opposed to misleading statements, involves a fact-intensive analysis. It is inappropriate for resolution on this motion to dismiss.

This Court finds that TotalEnergies must be dismissed for failure to be served with process.

**THEREFORE**, Defendants' Joint Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim is hereby **GRANTED IN PART AND DENIED IN PART**.

---

[247] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).
[248] *See City and County of Honolulu v. Sunoco LP*, 2023 WL 7151875, at *16 (Haw.).

Certain Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is hereby **DENIED**.

BP Defendants' Motion to Dismiss the Complaint for Failure to State a Claim Based Upon Misrepresentation is hereby **GRANTED, WITH LEAVE TO AMEND WITH PARTICULARITY**.

Marathon Defendants' Motion to Dismiss for Failure to State a Claim Sounding in Fraud is hereby **GRANTED, WITH LEAVE TO AMEND WITH PARTICULARITY**.

American Petroleum Institute's Individual Merits Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART**.

Hess Corporation's Supplemental Motion to Partially Dismiss for Failure to State a Claim on Statute of Limitations Ground (DCFA) is hereby **GRANTED**.

TotalEnergies SE's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service of Process is hereby **GRANTED ON THE BASIS OF INSUFFICIENT SERVICE OF PROCESS**.

Apache Corporation's Motion to Dismiss for Failure to State a Claim is hereby **GRANTED IN PART AND DENIED IN PART**.

CITGO Petroleum Corporation and Murphy USA Inc.'s Joint Motion to Dismiss for Failure to State a Claim is hereby **GRANTED IN PART WITH**

**LEAVE TO AMEND WITH PARTICULARITY, DENIED AS TO DUTY TO WARN**.

CNX Resources Corporation's Motion to Dismiss for Failure to State a Claim Based Upon Misrepresentation is hereby **GRANTED IN PART WITH LEAVE TO AMEND WITH PARTICULARITY, DENIED AS TO DUTY TO WARN**.

Marathon Oil Corporation's Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART**.

CONSOL Energy Inc.'s Motion to Dismiss for Failure to State a Claim is hereby **GRANTED IN PART WITH LEAVE TO AMEND WITH PARTICULARITY, DENIED AS TO DUTY TO WARN**.

Chevron Defendants' Anti-SLAPP Special Motion to Dismiss is hereby **DENIED**.

American Petroleum Institute's Motion to Strike and/or Dismiss the Complaint Under the District of Columbia's Anti-SLAPP Statute is hereby **DENIED**.

**IT IS SO ORDERED.**

_/s/ Mary M. Johnston_
The Honorable Mary M. Johnston

69